Patrick R. Leverty
**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

[Additional counsel on signature block]

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ANDREA CICERI, derivatively on behalf of CLEANSPARK, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ZACHARY K. BRADFORD, LORI L. LOVE, S. MATTHEW SCHULTZ, ROGER P. BEYNON, LARRY MCNEILL, and THOMAS L. WOOD, <br><br> Defendants, <br><br> and <br><br> CLEANSPARK, INC., <br><br> Nominal Defendant. | Case No.: |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Andrea Ciceri ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant CleanSpark, Inc. ("CleanSpark" or the "Company"), files this Verified Shareholder Derivative Complaint against Zachary K. Bradford ("Bradford"), Lori L. Love ("Love"), S. Matthew Schultz ("Schultz"), Roger P. Beynon ("Beynon"), Larry McNeill ("McNeill"), and Thomas L.

Wood ("Wood") (collectively, the "Individual Defendants," and together with CleanSpark, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of CleanSpark, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CleanSpark, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by CleanSpark's directors and officers from December 31, 2020 through the present, both dates inclusive (the "Relevant Period").

2.      Based in Woods Cross, Utah, CleanSpark is a technology company that claims to provide advanced software and intelligent controls for solutions to solve modern energy challenges. Specifically, the Company purportedly offers its customers a collection of software that provides end-to-end microgrid energy modeling, energy market communications, and energy management solutions. The Company's software is purportedly capable of enabling a microgrid to be scaled to a particular user's needs and can be widely implemented across commercial, industrial, military, agricultural, and municipal development.

3.      Upon acquiring the intellectual property rights to gasifier[1] technology in March 2014, the Company began operations in the alternative energy sector. Despite a checkered history of disclosure omissions and errors[2] and suffering cumulative net losses of more than $116.4 million since inception (including over $23.3 million in the fiscal year ended September 30, 2020), the Company has repeatedly been able to raise capital after continuously touting CleanSpark's business prospects, including its customers, contracts, and acquisitions.

4.      In particular, on December 31, 2020, the Company touted "[r]ecord [r]evenue" and "wins" for the Company in the form of "cashflow-positive" acquisitions. Unbeknownst to investors, however, the Company's recent acquisitions involved related party transactions and CleanSpark's purported growth plans and "wins" were significantly exaggerated.

5.      The truth emerged on January 14, 2021, when *Culper Research* published a report (the "Culper Report") titled, "Cleanspark (CLSK): Back to the Trash Can," which revealed, among other things, that the Individual Defendants caused the Company to overstate and, in some cases, fabricate certain of the Company's contracts and clients and that the Individual Defendants caused the Company to engage in various undisclosed related party transactions, which siphoned capital from shareholders to the benefit of Company insiders, or questionable uses of corporate assets. The Culper Report characterized CleanSpark as being "uninvestible" since the Company was built upon "lies and deceit" asserting that Defendants Bradford and Schultz had "habitually lied to investors" and "cannot be trusted."

6.      On this news, the price of the Company's stock dropped from $39.34 per share at the close of trading on January 13, 2021, to $35.71 per share at the close of trading on January 14, 2020, representing a loss in value of $3.63, or over 9.2%. The next trading day, the Company's stock continued its plunge,

---

[1] Gasification is a process that converts biomass or fossil fuel-based carbonaceous materials into gases, including nitrogen, carbon monoxide, hydrogen, and carbon dioxide.
[2] https://seekingalpha.com/article/4085833-cleanspark-inc-seriously-overvalued-and-issues-galore.  Last visited February 8, 2021.

Verified Shareholder Derivative Complaint

closing at $31.15 per share on January 15, 2020, representing an additional loss in value of $4.56, or nearly 12.8%. In total, over the course of those two trading days, the Company's stock price fell $8.19 per share, representing a loss in value of over 20.8%.

7.      In breach of their fiduciary duties, prior to and during the Relevant Period, the Individual Defendants engaged in and or caused the Company to engage in numerous related party transactions (often undisclosed as such) that have materially benefited insiders to the detriment of the Company, including, but not limited to: (1) entering into a stock purchase agreement with p2klabs, Inc. ("p2k") while the Company's Chief Financial Officer ("CFO"), Defendant Love, served as an officer of p2k; (2) allowing the Company to engage with purported customers owned and/or controlled by Defendant Love, and/or the Company's Chief Revenue Officer ("CRO"), Amer Tadayon ("Tadayon"); (3) entering into an agreement with LAWCLERK.LEGAL ("LAWCLERK") while Tadayon was employed by LAWCLERK; (4) entering into a sub-lease with Defendant Bradford's accounting practice, Blue Chip Accounting, LLC ("Blue Chip"), for office space;[3] (5) engaging Defendant Bradford's accounting practice, Blue Chip, for accounting, tax, and administrative services; (6) entering into an agreement with Zero Positive, LLC ("Zero Positive"), an entity controlled by former officer and director, Bryan Huber ("Huber"); and (7) entering into a consulting agreement with former Chief Executive Officer ("CEO") and Chairman, and current Executive Chairman, Defendant Schultz, for management services (collectively, the "Related Party Transactions").

8.      In addition to the Related Party Transactions, the Individual Defendants engaged in and/or caused the Company to engage in further questionable uses of corporate assets that were unrelated or otherwise indiscriminate to CleanSpark's business and growth prospects consisting of, but not limited to, the following: (1) CleanSpark's acquisition of ATL Data Centers LLC ("ATL"); (2) CleanSpark's

---

[3] According to the Company's annual report for the fiscal year ended September 30, 2020, filed with the SEC on Form 10-K on December 17, 2020 (the "2020 10-K"), Defendant Bradford beneficially owns 50% of Blue Chip.

excessive compensation of its executive officers, certain non-employee directors, and certain non-employee consultants; and (3) the Company's investment in International Land Alliance ("ILA") (collectively, the "Questionable Uses of Corporate Assets").

9. During the Relevant Period, the Individual Defendants further breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company engaged in the undisclosed Related Party Transactions and Questionable Uses of Corporate Assets (together, the "Mismanagement"); (2) CleanSpark had significantly exaggerated key elements of its business operations, including purported customer and contract data; and (3) due to the foregoing, the Company's business, operations, and prospects were materially overstated. As a result, the Company's public statements were materially false and misleading at all relevant times.

10. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11. In further breach of their fiduciary duties, the Individual Defendants engaged in and/or allowed the Company to engage in the Mismanagement, causing themselves to receive, *inter alia*, excessive compensation.

12. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, internal controls over financial reporting, and internal controls over information technology, the latter of which the Company disclosed in its management assessment and the audit report included in the 2020 10-K.

13.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's President and CEO, and the Company's CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's current directors, of the substantial likelihood of the CEO's liability in the Securities Class Action and the current directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

16.     Plaintiff's claims also raise a federal question pertaining to the Exchange Act claims made in the Securities Class Action.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

Verified Shareholder Derivative Complaint

18.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and within this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

22.     Venue is proper in this District because Cleasnspark is incorporated in this District, CleanSpark and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of CleanSpark. Plaintiff has continuously held CleanSpark common stock at all relevant times. Plaintiff is a citizen of Canada.

### Nominal Defendant CleanSpark

24.     CleanSpark is a Nevada corporation with its principal executive offices located at 1185 S. 1800 W., Suite 3, Woods Cross, Utah 84087. CleanSpark's shares trade on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "CLSK."

### Defendant Bradford

25.     Defendant Bradford has served as the Company's President and CEO since October 2019 and as a Company director since March 2014. Previously, he served as the Company's CFO from March 2014 until October 2019. According to the 2020 10-K, as of December 16, 2020, Defendant Bradford beneficially owned 595,695 shares of the Company's common stock, which represented 2.48% of outstanding shares of Company stock as of that date. Given that the price per share of the Company's common stock on December 16, 2020 was $16.53, Defendant Bradford owned over $9.8 million worth of CleanSpark stock.

26.     For the fiscal year ending September 30, 2021, Defendant Bradford is entitled to receive handsome compensation from the Company pursuant to an employment agreement dated October 26, 2020, consisting of, *inter alia*, $500,000 in base salary, an annual discretionary cash bonus based on the annual gross revenues of the Company and other benchmarks that may be identified at the discretion of the Board that is equivalent to no less than 50% of his base salary, and a combination of restricted stock and stock options as incentive compensation that is at least 50% in value to his base salary.

27.     The Company's 2020 10-K stated the following about Defendant Bradford:

> ***Zachary K. Bradford***, Chief Executive Officer, is a licensed Certified Public Accountant in Nevada and a member of the American Institute of Certified Public Accountants. He served as the Company's Chief Financial Officer from 2014 through October 2019. He has also served as a partner in a public accounting and consulting firm in Henderson, Nevada since June 2013. Mr. Bradford holds a B.S. in Accounting and a Masters of Accountancy from Southern Utah University. From March of 2015 to July 31, 2016, Mr. Bradford served as a member of the board of directors and Chief Financial Officer of Epic Stores Corp.
>
> Aside from that provided above, Mr. Bradford does not hold and has not held over the past five years any other directorships in any company with a class of securities registered pursuant to Section 12 of the Exchange Act or subject to the requirements of Section 15(d) of the Exchange Act or any company registered as an investment company under the Investment Company Act of 1940.
>
> Mr. Bradford is qualified to serve on our Board of Directors because of his experience and knowledge in public company reporting and accounting.

28.     Upon information and belief, Defendant Bradford is a citizen of Nevada.

**Defendant Love**

29.     Defendant Love has served as the Company's CFO since October 2019. According to the 2020 10-K, as of December 16, 2020, Defendant Love beneficially owned 114,387 shares of the Company's common stock. Given that the price per share of the Company's common stock on December 16, 2020 was $16.53, Defendant Love owned nearly $1.9 million worth of CleanSpark stock.

30.     For the fiscal year ending September 30, 2021, Defendant Love is entitled to receive handsome compensation from the Company pursuant to an employment agreement dated October 26, 2020, consisting of, *inter alia*, $350,000 in base salary, an annual discretionary cash bonus based on the EBITDA[4] improvement of the Company and other benchmarks that may be identified at the discretion of the Board that is equivalent to no less than 20% of her base salary, and a combination of restricted stock and stock options as incentive compensation that is at least 50% in value to her base salary.

31.     The Company's 2020 10-K stated the following about Defendant Love:

> **Lori Love,** Chief Financial Officer, is a licensed CPA and an experienced finance professional serving in roles in accounting, finance and risk management. Since July 2015, Ms. Love served as CFO of P2K Labs, a design, technology, and marketing agency based in Las Vegas, Nevada. Prior to 2015, Ms. Love served in the role of Senior Vice President of Finance at Provident Trust Group for over two years and as Vice President of Finance and Operations at WorldDoc, Inc. where she also served as a director. Ms. Love obtained her Bachelor of Business Administration (BBA) in Accounting from University of Nevada, Las Vegas and carries the CPA designation.
>
> Aside from that provided above, Ms. Love does not hold and has not held over the past five years any other directorships in any company with a class of securities registered pursuant to Section 12 of the Exchange Act or subject to the requirements of Section 15(d) of the Exchange Act or any company registered as an investment company under the Investment Company Act of 1940.

32.     Upon information and belief, Defendant Love is a citizen of Nevada.

**Defendant Schultz**

---

[4] "EBITDA" is a company's earnings before interest, taxes, depreciation, and amortization. EBITDA is often used as a measure of a company's overall financial performance and as an alternative to net income in some circumstances.

33.     Defendant Schultz has served as the Company's Executive Chairman since October 2020, as Chairman of the Board since October 2019, and as a Company director since March 2014. Previously, he served as the Company's CEO from March 2014 until October 2019. According to the 2020 10-K, as of December 16, 2020, Defendant Schultz beneficially owned 734,796 shares of the Company's common stock, which represented 3.06% of outstanding shares of Company stock as of that date. Given that the price per share of the Company's common stock on December 16, 2020 was $16.53, Defendant Schultz owned over $12.1 million worth of CleanSpark stock.

34.     For the fiscal year ending September 30, 2021, Defendant Schultz is entitled to receive handsome compensation from the Company pursuant to an employment agreement dated October 26, 2020, consisting of, *inter alia*, $350,000 in base salary, an annual discretionary cash bonus based on the annual gross revenues of the Company and other benchmarks that may be identified at the discretion of the Board that is equivalent to no less than 50% of his base salary, and a combination of restricted stock and stock options as incentive compensation that is at least 50% in value to his base salary.

35.     The Company's 2020 10-K stated the following about Defendant Schultz:

> ***S. Matthew Schultz***, Executive Chairman, Chairman of the Board and Director, served as the Company's Chief Executive Officer from 2014 through October 2019 and has been involved in many capacities with several publicly traded companies. He served as the President and CEO of Amerigo Energy, Inc., creating multiple syndicated offerings, as well as overseeing the operations from permitting through production. Since 1999, he has assisted numerous development and early stage companies to secure financing and experience significant growth. As the President of Wexford Capital Ventures, Inc., he was instrumental in funding companies both domestically and abroad. While serving as the Chairman of Pali Financial Group, Inc., he assisted in market development of dozens of public corporations. He was a founding member and the Vice President of the Utah Consumer Lending Association.
>
> Aside from that provided above, Mr. Schultz does not hold and has not held over the past five years any other directorships in any company with a class of securities registered pursuant to Section 12 of the Exchange Act or subject to the requirements of Section 15(d) of the Exchange Act or any company registered as an investment company under the Investment Company Act of 1940.

Mr. Schultz is qualified to serve on our Board of Directors because of his experience and knowledge in public company reporting and financing and work in the energy sector.

36.     Upon information and belief, Defendant Schultz is a citizen of Utah.

**Defendant Beynon**

37.     Defendant Beynon has served as a Company director since October 2019. He also serves as the Chair of the Audit Committee. According to the 2020 10-K, as of December 16, 2020, Defendant Beynon beneficially owned 9,955 shares of the Company's common stock. Given that the price per share of the Company's common stock on December 16, 2020 was $16.53, Defendant Beynon owned over $164,556 worth of CleanSpark stock.

38.     The Company's 2020 10-K stated the following about Defendant Beynon:

***Roger P. Beynon***, is an experienced CPA and owner of Beynon & Associates, a public accounting firm that has been in operation for over 34 years. Mr. Beynon has provided accounting and tax services to businesses since 1984. Mr. Beynon is a Certified Public Accountant (CPA) and Certified Fraud Examiner (CFE) and is a past president of the Utah Association of CPA's.  Mr. Beynon is currently the chairman of the board of directors of Transwest Credit Union. Mr. Beynon is a graduate from Weber State College in 1972 with a bachelor's degree in accounting and a minor in banking and finance. Mr. Beynon will serve as a member of the Board until his successor is elected and qualified, or until his earlier death, resignation, or removal.

Mr. Beynon is qualified to serve on our Board of Directors because of his experience and knowledge in public company reporting and accounting.

39.     Upon information and belief, Defendant Beynon is a citizen of Utah.

**Defendant McNeill**

40.     Defendant McNeill has served as a Company director since January 2015. He also serves as the Chair of the Compensation Committee, as the Chair of the Nominations and Governance Committee, and as a member of the Audit Committee. Previously, Defendant McNeill served as the Company's Chairman of the Board. According to the 2020 10-K, as of December 16, 2020, Defendant McNeill beneficially owned 189,836 shares of the Company's common stock, which represented 0.79% of outstanding shares of Company stock as of that date. Given that the price per share of the Company's

common stock on December 16, 2020 was $16.53, Defendant McNeill owned over $3.1 million worth of CleanSpark stock.

41.     Upon information and belief, for the fiscal year ending September 30, 2021, Defendant McNeill is entitled to receive substantial compensation from the Company for his roles as a Company director and as the Chair of the Compensation Committee, the Chair of the Nominations and Governance Committee, and as a member of the Audit Committee.[5]

42.     The Company's 2020 10-K stated the following about Defendant McNeill:

> ***Larry McNeill***, Director, has a master's degree in Business Administration from Armstrong University, a BA in Business Administration, Economics, and Russian language from Minnesota State University, and has completed the course work towards his PhD in Business Management.
>
> Larry has a diverse business background that includes a range of broad business skills gained from his many roles in Real Estate, Finance, Research, Legal, Management, and Business Strategies. These roles include serving as the Director of Safeway Grocery Stores, Inc's Consumer, Sales, and Store Location research departments where he was responsible for the expansion of Safeway in Europe, Australia and Canada. The Director of Market Research for A&P where he was responsible for the Company's expansion into Saudi Arabia. An Executive Officer of Smiths Food and Drug Centers for 17 years; most recently as the Senior Vice President of Corporate Development overseeing the Research, Real Estate, and Legal Departments. Mr. McNeill retired from Smith's Food & Drug Stores in 1996 after the Fred Meyer merger was completed.
>
> Aside from that provided above, Mr. McNeill does not hold and has not held over the past five years any other directorships in any company with a class of securities registered pursuant to Section 12 of the Exchange Act or subject to the requirements of Section 15(d) of the Exchange Act or any company registered as an investment company under the Investment Company Act of 1940.
>
> Mr. McNeill is qualified to serve on our Board of Directors because of his experience and knowledge in business management and financing.

43.     Upon information and belief, Defendant McNeill is a citizen of Utah.

**Defendant Wood**

---

[5] By way of example, for the fiscal year ended September 30, 2020, Defendant McNeill received $131,250 in compensation from the Company. This included $30,000 in fees earned or paid in cash and $101,250 in option awards.

44. Defendant Wood has served as a Company director since October 2019. He also serves as a member of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominations and Governance Committee. According to the 2020 10-K, as of December 16, 2020, Defendant Wood beneficially owned 53,960 shares of the Company's common stock. Given that the price per share of the Company's common stock on December 16, 2020 was $16.53, Defendant Wood owned approximately $891,959 worth of CleanSpark stock.

45. The Company's 2020 10-K stated the following about Defendant Wood:

> **Dr. Thomas L. Wood**, has over 33 years of highly successful experience in positions of increasing responsibility in planning and operations, policy development/implementation, construction management, defense acquisition, budgeting and programming, and managing large projects and programs. Dr. Wood previously served in the U.S. Navy rising to the role of Deputy Operations for the Navy's Pacific Engineering Command in which he was responsible for ensuring the successful execution through nine field offices of nearly $1 billion annually in construction and services contracts. After leaving the U.S. Navy, Dr. Wood served as a Subject Matter Expert (SME) supporting the U.S. Pacific Command (USPACOM) Joint Interagency Coordination Group (JIACG) as a Sr. Military Analyst and continued as a civil servant in senior roles thereafter. Dr. Wood graduated from Union College with a bachelor's degree in Civil Engineering and master's degree in Civil Engineering from University of Maryland, College Park. Dr. Wood then obtained a Doctor of Business Administration degree from Argosy University, Honolulu.. [sic] Dr. Wood will serve as a member of the Board until his successor is elected and qualified, or until his earlier death, resignation, or removal.
>
> Mr. Wood is qualified to serve on our Board of Directors because of his experience and knowledge in business management and financing.

46. Upon information and belief, Defendant Wood is a citizen of Hawaii.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47. By reason of their positions as officers and/or directors of CleanSpark, and because of their ability to control the business and corporate affairs of CleanSpark, the Individual Defendants owed CleanSpark and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CleanSpark in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CleanSpark and its shareholders so as to benefit all shareholders equally.

48.     Each director and officer of the Company owes to CleanSpark and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CleanSpark, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the officers and directors of CleanSpark were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CleanSpark, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

52.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory

filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

53.     To discharge their duties, the officers and directors of CleanSpark were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of CleanSpark were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York, Nevada, Utah, and the United States, and pursuant to CleanSpark's Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how CleanSpark conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of CleanSpark and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that CleanSpark's operations would comply with all applicable laws and CleanSpark's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.      Each of the Individual Defendants further owed to CleanSpark and the shareholders the duty of loyalty requiring that each favor CleanSpark's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.      At all times relevant hereto, the Individual Defendants were the agents of each other and of CleanSpark and were at all times acting within the course and scope of such agency.

56.      Because of their advisory, executive, managerial, and directorial positions with CleanSpark, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by CleanSpark.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to

conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

59.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of CleanSpark was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of CleanSpark, and was at all times acting within the course and scope of such agency.

# CLEANSPARK'S CODE OF CONDUCT AND GOVERNANCE

## Code of Conduct

63.     The Company's Code of Conduct states that it "applies to all of [CleanSpark's] directors, officers, employees and consultants," that the Company "refer[s] to all officers and other employees covered by this Code as 'Company employees' or simply 'employees,' unless the context otherwise requires," and that the Company "refer[s] to [its] principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions, as [its] 'principal financial officers.'"

64.     The Code of Conduct also states that it "contains general guidelines for conducting the business of CleanSpark" that are "consistent with the highest standards of business ethics."

65.     In a section titled, "Reporting Violations of the Code," the Code of Conduct states the following, in relevant part:

> All employees, consultants and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company. If you know of or believe there has been a violation of this Code, immediately report the conduct to your supervisor or the Responsible Party.

> \* \* \*

> It is Company policy that any employee, consultant or director who violates this Code, or who directs or approves a violation of this Code, may be subject to appropriate discipline, which may include termination of employment or the consulting relationship or removal from the Company's Board of Directors (the "Board of Directors"), as appropriate.

66.     In a section titled, "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> A conflict of interest can occur when an employee's, consultant's or director's private interest interferes, or appears to interfere, with the interests of the Company as a whole. You should avoid any private interest that influences your ability to act in the interests of the Company or that makes it difficult to perform your work objectively and effectively.

> \* \* \*

<u>Improper Personal Benefits</u>. No employee, consultant or director should obtain any material (as to him or her) personal benefits or favors because of his or her position with the Company.

\* \* \*

<u>Financial Interests</u>. No employee should have a significant financial interest (ownership or otherwise) in any company that the individual knows or has reason to believe is a material customer, supplier or competitor of the Company. A "significant financial interest" includes (i) ownership of greater than 5% of the equity of a material customer, supplier or competitor or (ii) an investment in a material customer, supplier or competitor that represents more than 5% of the total assets of the employee.

<u>Loans or Other Financial Transactions</u>. No employee should obtain loans or guarantees of personal obligations from, or enter into any other personal financial transaction with, any company that the individual knows or has reason to believe is a material customer, supplier or competitor of the Company.

\* \* \*

<u>Service on Boards and Committees</u>. No employee or director should join, or serve on more than a temporary basis (more than six months) on, a board of directors or trustees or on a committee of any entity (whether profit or not-for-profit) whose interests reasonably would be expected to materially conflict with those of the Company.

67.     The section of the Code of Conduct titled, "Conflicts of Interest," further states the following, in relevant part:

**Disclosure of Conflicts of Interest**

The Company requires that employees, consultants and directors disclose any situation that reasonably would be expected to give rise to a conflict of interest. If you reasonably believe that you have a conflict of interest, or something that others would reasonably perceive as a conflict of interest, you must report it in writing to your supervisor or the Responsible Party. Your supervisor and the Responsible Party will work with you to determine whether you have a conflict of interest and, if so, how best to address it. Although conflicts of interest are not prohibited in all cases, they are not desirable and may only be waived as described in "Waivers of the Code" above.

(Emphasis in original.)

68.     In a section titled, "Fair Dealing," the Code of Conduct states the following, in relevant part:

All employees, consultants and directors should endeavor to deal fairly and honestly with fellow Company personnel and with the Company's vendors, suppliers and competitors.

Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

69.     In a section titled, "Company Records," the Code of Conduct states the following, in relevant part:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports and many other aspects of our business and guide our business decision-making and strategic planning. Company records include booking information, payroll, timecards, travel and expense reports, e-mails, accounting and financial data, measurement and performance records, electronic data files, personnel records, records relating to our intellectual property, product development and collaborations and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects.

70.     In a section titled, "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct states the following, in relevant part:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's Chief Financial Officer and other employees working in the Finance Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

71.     In a section titled, "Compliance with Laws and Regulations," the Code of Conduct states the following, in relevant part:

Each employee, consultant and director has an obligation to comply with all laws, rules and regulations of the United States, and any other jurisdictions, that are applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, export control, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position.

72.     The Code of Conduct concludes that it "contains general guidelines for conducting the business of the Company consistent with the highest standards of business ethics and in compliance with all applicable laws" and that the Company "expects all of its employees, consultants and directors to adhere to these standards."

**Audit Committee Charter**

73.     According to the Audit Committee Charter, the stated purpose of the Audit Committee is to assist the Board with oversight of the:

a)     integrity of the Company's financial statements and internal controls;
b)     Company's compliance with the legal and regulatory requirements;
c)     Independent registered public accounting firm's qualifications and independence; and
d)     Internal audit functions of the Company and its independent registered public accounting firm.

74.     Under the section titled, "Responsibilities," the Audit Committee Charter states the following, in relevant part:

Obtain the advice and assistance, as appropriate, of independent counsel and other advisors as necessary to fulfill the responsibilities of the Audit Committee, and receive appropriate funding from the Company, as determined by the Audit Committee, for the payment of compensation to any such advisors, registered public accounting firm and ordinary administrative expenses necessary or appropriate in carrying out its duties.

**Compensation Committee Charter**

75.     According to the Compensation Committee Charter, the stated purpose of the Compensation Committee is to "oversee the discharge of the responsibilities of the Board relating to compensation of the Company's chief executive officer and all other executive officers of the Company."

76.     Under the section titled, "Responsibilities," the Compensation Committee Charter states that the Compensation Committee is "directly responsible for establishing annual and long-term performance goals and objectives for our Executive Officer … as well as setting the overall compensation philosophy for the Company" and that:

[t]his responsibility includes:

(i)     evaluating the performance of the CEO and all other Executive Officer(s) in light of the approved performance goals and objectives;

(ii)    setting the compensation of the CEO and all other Executive Officer(s) based upon the evaluation of the performance of the CEO and the other Executive Officer(s), respectively;

(iii)   making recommendations to the Board of Directors with respect to new cash-based incentive compensation plans and equity-based compensation plans; and

(iv)    preparing an annual performance self-evaluation of the Compensation Committee.

In addition, the Compensation Committee:

(i)     administers the Company's stock plans;

(ii)    determines and certifies the shares awarded under corporate performance-based plans;

(iii)   grants options and awards under the stock plans;

(iv)    advises on the setting of compensation for senior executives whose compensation is not otherwise set by the Compensation Committee; and

(v)     monitors compliance by officers with our program of required stock ownership.

77.     In violation of the Code of Conduct and the Company's other governance policies, the Individual Defendants conducted little, if any, oversight of the Mismanagement (which the Individual Defendants engaged in and/or permitted despite being aware of it), or the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

78.     CleanSpark is a Nevada technology company that purportedly provides advanced software and intelligent controls for solutions to solve modern energy challenges. Specifically, the Company claims to offer its customers a collection of software that provides end-to-end microgrid energy modeling, energy market communications, and energy management solutions. The Company's software is supposedly capable of enabling a microgrid to be scaled to a particular user's needs and can be widely implemented across commercial, industrial, military, agricultural, and municipal development.

79.     CleanSpark was originally incorporated under the moniker "SmartData Corporation" in 1987 as a private company. By the end of that year, the Company conducted a public offering and began trading publicly by early-1988. Originally, the Company distributed and sold computer hardware and software that provided small businesses a framework to measure productivity and also offered additional services such as leasing, insurance benefits, and retirement planning. However, after the untimely death of the Company's founder, the Company discontinued its business operations in 1992. Thereafter, the Company was looking to adopt a business plan and recommence operations while also investigating potential assets, property, or businesses to acquire. Finally, upon the acquisition of intellectual property rights in gasifier technology from SMS Management Services, LLC ("SMS") in March 2014, the Company began operations in the alternative energy sector and changed its name to "Statean Inc.," before later rebranding once more to CleanSpark after a short-form merger in October 2016.

80.     Notably, the Company appears to have a history of disclosure omissions and errors. Specifically, according to a *Seeking Alpha* article published on July 5, 2017, the Company failed to disclose, *inter alia*, the following information about its officers and directors in its SEC filings: (i) Defendant Schultz's experience between August 23, 2010 and March 13, 2014; (ii) a detailed description of Defendant Schultz's experience at Amerigo Energy, Inc. ("Amerigo"); (iii) a detailed description of Defendant Bradford's role as CFO with Epic Stores, LLC ("Epic"), particularly in light of the Epic's decision to cease operations and liquidate its assets; (iv) Defendant Bradford's appointment to serve as

CleanSpark's President; (v) Defendant Bradford's experience prior to June 2013, including his role as Senior Auditor and then as a Partner at De Joya Griffith Consulting LLC ("De Joya Griffith"), which had been the target of an SEC enforcement action for allegedly conducting materially deficient audits and violating Public Company Accounting Oversight Board audit standards, resulting in the firm's ban from practicing before the SEC for at least five years; (vi) Defendant McNeill's recent work experience; and (vii) among others, Defendant Schultz's beneficial ownership and control of various companies, including Amerigo and SMS which were either related to or beneficially owned CleanSpark.

81.     The Individual Defendants are no stranger to questionable business relationships, some of which may rise to the level of a conflict of interest. For example, while serving as CFO at Epic, Defendant Bradford's accounting firm, Blue Chip, which he co-founded, served as Epic's auditor. Additionally, CleanSpark has engaged Water Tower Research, a company run by Sean Severson, who was recently the target of an SEC Cease-and-Desist Proceeding in February 2020, for promotional services.

82.     Notably, prior to the beginning of the Relevant Period, the Company touted the following purported successes.

83.     On October 3, 2017, the Company announced that Green Dragon, a controlled distribution agriculture cannabis company based in North Hollywood, California, had "contracted CleanSpark as their microgrid solutions provider."

84.     In November 2019, the Company inked an agreement with ILA to provide microgrid software services to support system design and engineering for ILA energy projects for exclusively for 10 years. Simultaneously, the Company announced that it would be making a direct investment in ILA of up to $500,000 in exchange for 1,000 shares of ILA's preferred stock and 350,000 shares of ILA's common stock.

85.     Recently, the Company has been actively pursuing mergers with and/or acquisitions of businesses as part of CleanSpark's purported growth strategy. Particularly, on January 31, 2020, the

Company entered into an agreement with p2k and its sole stockholder and CEO, Defendant Tadayon, who has served as CleanSpark's CRO since that same date, whereby the Company acquired all of p2k's outstanding shares of stock in exchange for cash and shares of Company common stock, together valued at $1.6 million.

86.     Also, in October 2020, the Company, through p2k, purportedly entered into an agreement with an existing client, LAWCLERK. Under the agreement, LAWCLERK had supposedly agreed to extend its contract which, through p2k, had retained CleanSpark's professional services, including digital design and development initiatives, in exchange for over $1.0 million.

87.     On December 9, 2020, after another company, Marathon Patent Group, Inc., withdrew its offer during its due diligence process, CleanSpark entered into an agreement with ATL, whereby ATL survived a merger and continued operating as a wholly-owned subsidiary of CleanSpark in exchange for, *inter alia*, approximately $19.4 million worth of shares of Company common stock as of the closing date, December 10, 2020.

**The Mismanagement**

88.     During the Relevant Period, the Individual Defendants engaged in, permitted and/or maintained, and caused the Company to engage in the Mismanagement. The Individual Defendants allowed multiple violations of CleanSpark's corporate governance policies to occur that injured the Company. These violations included, but were not limited to, engaging in and/or permitting the Mismanagement and engaging in or allowing widespread violations of the Company's Code of Conduct and governance policies as alleged herein. The Mismanagement resulted in, among other things, adverse news reports, including the Culper Report, costly litigation, including the Securities Class Action, and, consequently, a decline in the value of the Company, as alleged herein.

***Related Party Transactions***

89.     Specifically, the Individual Defendants have used CleanSpark to enter into numerous related party transactions, some which the Company has failed to identify as such, unbeknownst and to the detriment of Company shareholders.

**p2k Acquisition**

90.     The Company's acquisition of p2k in January 2020, was not disclosed as a related party transaction, even though Defendant Love, the Company's CFO since October 2019, was listed on p2k's corporate documents as an officer of p2k since at least November 12, 2018. Additionally, the list of p2k's purported customers including, but not limited to, Monster Shield, LLC ("Monster Shield") and Cirrina, Inc. ("Cirrina") on its website appear to be owned and/or controlled by Company insiders. For example, Defendant Love is listed as the Secretary and Treasurer of Cirrina on the company's corporate registration and Defendant Tadayon is listed as Cirrina's President and director.[6] Defendant Tadayon is also listed as Monster Shield's agent.[7]

**LAWCLERK Contract**

91.     The Company's agreement with LAWCLERK in October 2020, was not disclosed as a related party transaction even though Defendant Tadayon, the Company's CRO since the Company's p2k acquisition in January 2020, was listed as LAWCLERK's Chief Product Officer.[8] According to the Culper Report, LAWCLERK's website stated that Tadayon has "led the development and technology team at LAWCLERK from its conception [.]" Defendant Tadayon himself was quoted in the Company's press

---

[6] https://esos.nv.gov/EntitySearch/BusinessInformation. Last visited February 11, 2021.
[7] *See* https://uspto.report/TM/87026544. Last visited February 11, 2021.
[8] http://www.lawtechnologytoday.org/wp-content/uploads/2019/02/Lawclerk_Final-PressKit_FEB_19.pdf.     Last     visited     February     11,     2021.     *See     also* https://web.archive.org/web/20200807004916if_/https://about.lawclerk.legal/. Last visited February 11, 2021.

release that announced the renewal of LAWCLERK's business, deceitfully touting that it demonstrated CleanSpark has "proven [its] value as a trusted partner with [its] clients."

**Disclosed Related Party Transactions**

92.   The Company has also engaged in several dubious related party transactions with insiders at the Company, including Defendant Bradford, Huber, and Defendant Schultz. Upon information and belief, these transactions are part and parcel of the Individual Defendants' ploy to materially benefit themselves to the Company's and investors' detriment. For example, as disclosed in the 2020 10-K, the Company entered into a sub-lease with Defendant Bradford's accounting practice, Blue Chip for office space and paid Blue Chip $14,725 for rent and also paid Blue Chip $131,248 for accounting, tax, administrative services, and reimbursement for office supplies.   The Company also entered into an agreement with Zero Positive, an entity controlled by former officer and director, Huber, and issued warrants to purchase 90,000 shares of common stock at $8.00 per share to Zero Positive (valued at over $2.6 million). The Company also entered into a consulting agreement with Defendant Schultz, for "management services" and paid him $1,086,200 as compensation for his services as chairman of the board during the year ended September 30, 2020 and paid an organization he is affiliated with $49,500 in fees plus $176,000 in expense reimbursements during the 2020 fiscal year.

*Fabrications and Overstatements of Business*

93.   In connection with the Mismanagement, the Individual Defendants have caused the Company to overstate certain business dealings and, in some instances, flat out fabricate others. For example, according to the Culper Report, despite claiming in October 2017 that the Company contracted with Green Dragon to provide it microgrid solutions and touting its "best-in-class" solution design in connection thereto in December 2018, Green Dragon's founder claimed to have never been a customer of CleanSpark.

94.     In January 2020, the Company issued a press release announcing an agreement with Shoreline Unified School District, which analysts predicted could generate around $2-3 million[9] for the Company in revenues. However, according to the Culper Report, a representative for the Shoreline Unified School District maintained that if an agreement were executed, it would not likely generate more than $300,000.

95.     Additionally, according to the Culper Report, although Defendant Bradford characterized the Company's agreement with ILA as a "game changer," and the Company had confirmed an "initial roll-out this year," the Company "has not yet deployed a single microgrid to any [ILA] properties" as of January 14, 2021.

### *Questionable Uses of Corporate Assets*

96.     Moreover, in addition to the Related Party Transactions and overstatements of key elements of the Company's business, the Individual Defendants have used and continue to use CleanSpark's corporate assets inappropriately to their benefit while harming the Company and CleanSpark shareholders.

### **ATL Acquisition**

97.     The Company's acquisition of bitcoin miner, ATL, in December 2020, has been described as a "gutless promotion attempt" by *Culper Research* and constitutes a questionable use of corporate assets. Initially, while Defendant Bradford claimed that the Company began its due diligence process relating to the ATL acquisition in February 2020, ATL was only organized on April 13, 2020. According to the Culper Report, while the Company has repeatedly advertised that ATL's mining operations are profitable so long as the price of bitcoin remains above $6,000, the Company has failed to disclose that the currently subsidized rate at which Fastblock Mining, ATL's previous principal, provides power to

---

[9]     https://www.proactiveinvestors.com/companies/news/912919/hc-wainwright-reiterates-buy-rating-with-18-price-target-on-cleanspark-citing-strong-growth-outlook-912919.html. Last visited February 11, 2021.

ATL ($0.0285KwH) is likely to expire pursuant to an agreement and subsequently increase within the next three years. Moreover, although the Company had raised $40 million in October 2020, as touted in the press release that announced the acquisition of ATL, the Company did not use those funds towards the acquisition but instead deviously issued new shares to raise additional capital and further dilute equity holdings of Company shareholders.

### Excessive Compensation

98.     Separate and apart, but particularly in light of, the Mismanagement and other misconduct, as alleged herein, the Individual Defendants caused the Company to pay them excessive compensation. Each Individual Defendant continued receiving substantial compensation even as they breached their fiduciary duties to the Company. Regardless of their misconduct, upon information and belief, the Individual Defendants also received excessive compensation relative to compensation provided at comparable companies.

99.     In addition, Defendant Bradford as CEO continued receiving substantial compensation, which notably tripled from the fiscal year ended September 30, 2019 to the fiscal year ended September 30, 2020, even as he was being paid under a 2017 Equity Incentive Plan, as amended, as described in the Company's Schedule 14C filed with the SEC on July 28, 2020, under which compensation was determined in part by achieving certain performance goals.

100.     Notably, not only does Defendant Bradford's previous experience leave much to be desired, but he also appears to be a "part-time" CEO as he is still operating his Blue Chip business, as evidenced by LiveWire Ergogenics, Inc.'s March 6, 2020 filing with the SEC. Further, Defendant Schultz's prior experience is riddled with empty promises and failed business ventures including (1) his service as CEO of Granite Energy, Inc. ("Granite") where Granite had acquired Greenstart, Inc. which operated at losses and had its registration ultimately revoked by the SEC in 2013; and (2) his service as CEO of Amerigo, which also ultimately failed.

101.     Despite the Individual Defendants' lack of substantial experience and success, in the fiscal year ended September 30, 2020, the Company paid its executives approximately $6.2 million in disclosed compensation and paid an additional $6.5 million for "professional fees," some or all of which, upon information and belief, may have also been paid by CleanSpark to the Individual Defendants, while the Company only generated just over $10.0 million in revenue during that same fiscal period. By way of juxtaposition, the Company recorded approximately $6.8 million in payroll expenses and $10.45 million in interest expenses during the 2020 fiscal year.

102.     The Individual Defendants have caused the Company to continuously rely on capital raises by issuing outstanding shares of Company common stock and diluting shareholders' equity interest while raking in excessive compensation to the detriment of the Company. To that end, the Company's share count has increased from nearly 4.8 million shares of outstanding common stock in December 2019 to approximately 24.0 million shares of outstanding common stock only one year later in December 2020.

### *Failure to Maintain Internal Controls*

103.     During the Relevant Period, as evident by the Mismanagement, the Individual Defendants failed to maintain effective internal controls in managing the Company. Just prior to the Relevant Period, the Defendants admitted that they failed to maintain internal controls in their 2020 10-K. CleanSpark's 2020 10-K stated, in relevant part:

> We identified a material weakness in the design of internal control related to the following areas: (i) Inadequate controls over information technology.

> This material weakness did not result in any identified material misstatements to the financial statements, and there were no changes to previously released financial results. Based on this material weakness, management concluded that at September 30, 2020, internal control over financial reporting was not effective.

### **False and Misleading Statements**

### *December 31, 2020 Press Release*

104.   On December 31, 2020, the Company issued a letter to shareholders, by way of a press release also attached to a current report filed with the SEC on Form 8-K, and signed by Defendant Bradford that same day (the "December 31, 2020 Press Release"). The December 31, 2020 Press Release, which was signed by Defendants Bradford and Schultz, discussed the Company's purported fiscal year corporate developments, stating the following:

> We're proud of the efforts of our amazing stakeholders across the entire enterprise for successfully achieving a number of significant wins for the Company, including:

> - During our 2020 fiscal year, we completed successful acquisitions of GridFabric and p2klabs. Both acquired companies are cashflow-positive and provide us with entirely new verticals for growth. Subsequent policy shifts (FERC2222) should further accelerate growth in the GridFabric segment.'

> * * *

> - In early December 2020, we acquired ATL Data Centers in an 'all-stock' transaction. By leveraging our proprietary technologies, the Company expects to increase Bitcoin production while lowering total energy costs, thereby maximizing overall profitability. The anticipation of producing Bitcoins at what we believe will be potentially the lowest total energy cost in America is expected to be a substantial opportunity to market our proprietary energy solutions to other energy intensive operations throughout the world.

> * * *

> **Outlook**

> The Company expects the somewhat cyclical nature of our business to continue. As an example, approximately 10% of our fiscal 2020 revenue was realized in the quarter ending December 31, 2019. We anticipate this trend will continue in fiscal 2021 and we forecast that our second and third fiscal quarters will again be our strongest. We expect to generate $20 million in revenue related to our current business segments and we expect the recent acquisition of ATL Data Center to contribute a minimum of $10 million in additional Bitcoin-based (BTC-USD) revenues for 2021. We are working diligently to expand the data center capacity allowing us to further increase these initial estimates, but the Company's guidance will remain somewhat conservative until the expansion has been completed and we have sufficient data to forecast a firm outlook. Finally, as we have only recently begun to integrate ATL into our operations, we have not yet measured the potential additional value expected to be derived from the demonstration of our energy technologies within the data center for additional microgrid deployment and sales opportunities.

> (Emphasis added.)

105.    The statements referenced in ¶ 103 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company engaged in the Mismanagement; (2) CleanSpark had significantly exaggerated key elements of its business operations, including purported customer and contract data; and (3) due to the foregoing, the Company's business, operations, and prospects were materially overstated. As a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

106.    On January 14, 2021, *Culper Research* published the Culper Report, charging the Company with "fabricat[ing] key elements of its business, including purported customers and contracts" and contending that the Company is "rife with undisclosed related party transactions" that "siphoned capital from shareholders to the pockets of insiders." Further, the Culper Report outed Defendants Bradford and Schultz as "habitual[] li[ars]" and characterized the Company as "uninvestible."

107.    The Culper Report described the Company's most recent acquisition, the ATL acquisition, as "another [g]utless [p]romotion [a]ttempt." Specifically, the Culper Report stated the following, in relevant part:

> CleanSpark acquired ATL Data Centers, LLC on December 10, 2020. In the press release, CEO Zachary Bradford stated that: "We began early-stage analysis of ATL in February 2020 to evaluate expanding the facility's energy capacity and reducing energy costs." However, ATL wasn't created until April 13, 2020, per the State of Georgia:



**ATL Data Centers LLC**
a Domestic Limited Liability Company

has been duly organized under the laws of the State of Georgia on 04/13/2020 by the filing of articles of organization in the Office of the Secretary of State and by the paying of fees as provided by Title 14 of the Official Code of Georgia Annotated.

The press release also notes ATL's website, www.atl-data.com, which we find **was registered on December 8, 2020, just two days prior to CleanSpark announcing the acquisition:**



The data center itself was previously held by Virtual Citadel, Inc. which initiated bankruptcy proceedings upon the death of its founder. Out of the bankruptcy process, the assets then appear to be owned by "Fastblock Mining," whose principals were also listed principals of ATL Data Centers, LLC. See that ATL's merely days-old website uses the same branding as Fastblock:

To us, this hasty rebranding was an attempt to dissociate ATL from its checkered history. In August 2020, Marathon made an offer to acquire Fastblock / ATL. However, in September 2020, Marathon backed out of the deal, citing the upcoming expiration of its power agreement:

"During its due diligence process, the Company discovered that the Power Agreement pursuant to which Fastblock would provide power at a subsidized rate of $0.0285KwH, would expire in three years. The Company and Fastblock were unsuccessful in attempts to extend the term of that

agreement with the power provider to the 7–10 year Window which the Company would need for this acquisition to be economically feasible."

In numerous press releases and promotional interviews, CleanSpark has touted that ATL's mining operations are profitable with bitcoin prices above $6,000. However, CleanSpark has not disclosed to investors if it faces the same rate hike that made Marathon walk away. CleanSpark's potential lies of omission aside, we think investors buying CleanSpark for the Bitcoin-related hype are getting a broken-down Toyota Corolla, while CleanSpark claims it has a Porsche 911. ATL's single measly warehouse have present capacity of just 3,471 ASIC miners and 245 PH/s, a fraction of miners such as RIOT Blockchain (RIOT) and Marathon Patent Group (MARA).

(Emphasis in original.)

108.   Regarding the Company's February 2020 acquisition of p2k, the Culper Report stated that it was "an undisclosed related party transaction that has apparently fabricated its customers." The Culper Report further stated:

p2k's website lists customer logos, including Monster Shield and Cirrina Activewear, shown below. **However, Monster Shield, LLC is an Arizona corporation which lists CleanSpark Chief Revenue Officer Amer Tadayon as its sole member since February 2015. Tadayon was Founder and CEO of p2k Labs itself and is now CleanSpark's Chief Revenue Officer**[.]

* * *

[*Culper* was] unable to find any independent Cirrina web presence apart from p2k's website. **Highly dubious "customers" aside, we feel this begs the question of why CleanSpark acquired p2k Labs, which has zero relation to the Company's supposed focus in "clean energy software."**

Moreover, p2k Labs corporate documents registered in Nevada in November 2018 list current CleanSpark CFO Lori Love as an officer of the business well before she arrived at CleanSpark in October 2019, and well before CleanSpark closed on the acquisition of p2k Labs in February 2020:



**As such, we view CleanSpark's acquisition of p2k Labs to be yet another undisclosed related party transaction which essentially funneled capital from the Company to the pockets of insiders.**

(Emphasis in original.)

109.   Moreover, the Culper Report revealed an additional related party transaction, with LAWCLERK, that the Company had failed to disclose. The Culper Report stated, in relevant part:

On October 13, 2020, CleanSpark claimed to have executed a contract with LAWCLERK.LEGAL "valued in excess of $1 million." The press release included a quote from CleanSpark's CRO and p2klabs founder Amer Tadayon, which stated, in part, "This contract renewal shows that not only can we attract new business, but we have also proven our value as a trusted partner with our clients." We find this laughable, as on LAWCLERK's own website, Tadayon is shown as the company's Chief Product Officer:

**Amer Tadayon**
*Chief Product Officer*

A seasoned executive and entrepreneur, Amer Tadayon is co-founder and CEO of p2k Labs, a design, technology and marketing agency. As CPO of LAWCLERK, Amer brings more than 25 years of experience in all facets of business including technology, marketing, sales and design. He has held leadership positions at Fortune 500 companies including IBM, Cognizant and Frog Design. He has also worked with major global brands such as Nike, MTV and Mattel.

Amer has led the development and technology team at LAWCLERK from its conception to the creation of its online marketplace. As the company expands into new markets, he oversees the crossover of design, technology, function and user experience to make sure the LAWCLERK marketplace is positioned to revolutionize the practice of law.

As such, it appears that when Tadayon refers to "our clients," he's referring to himself in the third person, as this contract is a blatantly obvious undisclosed related party transaction.

110.   On this news, the price of the Company's stock dropped from $39.34 per share at the close of trading on January 13, 2021, to $35.71 per share at the close of trading on January 14, 2020, representing a loss in value of $3.63, or over 9.2%. The next trading day, the Company's stock continued its plunge, closing at $31.15 per share on January 15, 2020, representing an additional loss in value of $4.56, or nearly 12.8%. In total, over the course of those two trading days, the Company's stock price fell $8.19 per share, representing a loss in value of over 20.8%.

**DAMAGES TO CLEANSPARK**

111.    As a direct and proximate result of the Individual Defendants' conduct, CleanSpark will lose and expend many millions of dollars.

112.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its President and CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto and in connection to the Mismanagement.

113.    These expenditures also include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants, in light of the Mismanagement and other misconduct, as alleged herein, and who breached their fiduciary duties to the Company, including such amounts paid out in connection to meeting certain performance goals.

114.    As a direct and proximate result of the Individual Defendants' conduct, CleanSpark has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE ALLEGATIONS**

115.    Plaintiff brings this action derivatively and for the benefit of CleanSpark to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CleanSpark, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

116.    CleanSpark is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

117.    Plaintiff is, and has been at all relevant times, a shareholder of CleanSpark. Plaintiff will adequately and fairly represent the interests of CleanSpark in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

118.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

119.    A pre-suit demand on the Board of CleanSpark is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants Bradford, Schultz, Beynon, McNeill, and Wood (the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

120.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

121.    Demand is also excused as to all of the Directors because the Mismanagement was an unlawful business strategy that the Company engaged in and was not a valid exercise of business judgment. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

122.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary

duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

123.     Additional reasons that demand on Defendant Bradford is futile follow Defendant Bradford has served as the Company's President and CEO since October 2019 and as a Company director since March 2014. Previously, he served as the Company's CFO from March 2014 until October 2019. Thus, he is a non-independent director. The Company provides Defendant Bradford with his principal occupation, and he receives and is entitled to receive handsome compensation, including at least $500,000 in base salary and additional compensation as described herein for the fiscal year ending in 2021 for his services. Defendant Bradford was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the press release referenced herein. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Mismanagement (which Defendant Bradford engaged in and/or permitted despite being aware of it) or the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bradford signed, and thus personally made the false and misleading statements in the December 31, 2020 Press Release. Moreover, Defendant Bradford is a defendant in the Securities Class Action. For these reasons, Defendant Bradford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.     Additional reasons that demand on Defendant Schultz is futile follow. Defendant Schultz has served as the Company's Executive Chairman since October 2020, as Chairman of the Board since October 2019, and as a Company director since March 2014. Previously, he served as the Company's CEO from March 2014 until October 2019. Thus, he is non-independent director. Defendant Schultz receives and is entitled to receive handsome compensation, including at least $350,000 in base salary and

additional compensation as described herein for the fiscal year ending in 2021 for his services. As a trusted Company director, he conducted little, if any, oversight of the Mismanagement (which Defendant Schultz engaged in and/or permitted despite being aware of it) or the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Schultz signed, and thus personally made the false and misleading statements in the December 31, 2020 Press Release. For these reasons, Defendant Schultz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.    Additional reasons that demand on Defendant Beynon is futile follow. Defendant Beynon has served as a Company director since October 2019. He also serves as the Chair of the Audit Committee. Defendant Beynon has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Mismanagement (which Defendant Beynon engaged in and/or permitted despite being aware of it) or the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Beynon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.    Additional reasons that demand on Defendant McNeill is futile follow. Defendant McNeill has served as a Company director since January 2015. He also serves as the Chair of the Compensation Committee, as the Chair of the Nominations and Governance Committee, and as a member of the Audit Committee. Defendant McNeill has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the

Mismanagement (which Defendant McNeill engaged in and/or permitted despite being aware of it) or the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant McNeill breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.    Additional reasons that demand on Defendant Wood is futile follow. Defendant Wood has served as a Company director since October 2019. He also serves as a member of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominations and Governance Committee. Defendant Wood has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Mismanagement (which Defendant Wood engaged in and/or permitted despite being aware of it) or the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Wood breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.    Additional reasons that demand on the Board is futile follow.

129.    Defendants Beynon, McNeill, and Wood (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's financial reporting process, the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the integrity of the Company's

financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

130.     Defendants McNeill and Wood (the "Compensation Committee Defendants") served as members of the Compensation Committee and regularly approved compensation for the Individual Defendants, which was unjust and excessive in light of the Mismanagement and other misconduct, as alleged herein. The Compensation Committee Defendants failed to uphold their responsibilities with integrity and rewarded the Individual Defendants for the Mismanagement and other misconduct, as alleged herein. Thus, the Compensation Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

131.     The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendant Bradford served as the CFO of the Company underneath Defendant Schultz, who served as the CEO, from March 2014 until October 2019 when Defendant Bradford replaced Defendant Schultz who stepped down from his role. Defendant Schultz serves as the Company's Executive Chairman and now reports to Defendant Bradford who currently serves as the Company's CEO. Additionally, Defendants Bradford and Schultz have served on the Company's Board together since March 2014. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

132.     In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Mismanagement (which the Directors engaged in and/or permitted despite being aware of it) or the Company's internal controls over public reporting and of the Company's involvement in the Individual

Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

133.    CleanSpark has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CleanSpark any part of the damages CleanSpark suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

134.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

135.    The acts complained of herein constitute violations of fiduciary duties owed by CleanSpark's officers and directors, and these acts are incapable of ratification.

136.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of CleanSpark. If there is a directors' and officers' liability insurance policy

covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of CleanSpark, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

137.   If there is no directors' and officers' liability insurance, then the Directors will not cause CleanSpark to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

138.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

139.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CleanSpark's business and affairs.

141.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

142.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants

intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CleanSpark.

143.   In breach of their fiduciary duties, the Individual Defendants either engaged in or permitted, and/or allowed the Company to engage in the Mismanagement.

144.   In further breach of their fiduciary duties owed to CleanSpark, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company engaged in the Mismanagement; (2) CleanSpark had significantly exaggerated key elements of its business operations, including purported customer and contract data; and (3) due to the foregoing, the Company's business, operations, and prospects were materially overstated. As a result, the Company's public statements were materially false and misleading at all relevant times.

145.   The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

146.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

147.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CleanSpark's securities.

148.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CleanSpark's securities.

149.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CleanSpark has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

151.     Plaintiff on behalf of CleanSpark has no adequate remedy at law.

### SECOND CLAIM

**Against the Individual Defendants for Unjust Enrichment**

152.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CleanSpark.

154.     The Individual Defendants either benefitted financially from the improper conduct and their received lucrative profits, bonuses, stock options, or similar compensation from CleanSpark that was

tied to the performance or artificially inflated valuation of CleanSpark, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

155.   Plaintiff, as a shareholder and a representative of CleanSpark, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

156.   Plaintiff on behalf of CleanSpark has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Abuse of Control**

157.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CleanSpark, for which they are legally responsible.

159.   As a direct and proximate result of the Individual Defendants' abuse of control, CleanSpark has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, CleanSpark has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

160.   Plaintiff on behalf of CleanSpark has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants for Gross Mismanagement**

161.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CleanSpark in a manner consistent with the operations of a publicly-held corporation.

163.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CleanSpark has sustained and will continue to sustain significant damages.

164.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

165.   Plaintiff on behalf of CleanSpark has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

166.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

168.   Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

169.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

170.   Plaintiff on behalf of CleanSpark has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Bradford and Love for Contribution

**Under Sections 10(b) and 21D of the Exchange Act**

171.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.     CleanSpark, along with Defendants Bradford and Love are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Bradford and Love's willful and/or reckless violations of their obligations as officers and/or directors of CleanSpark.

173.     Defendants Bradford and Love, because of their positions of control and authority as officers and/or directors of CleanSpark, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of CleanSpark, including the wrongful acts complained of herein and in the Securities Class Action.

174.     Accordingly, Defendants Bradford and Love are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

175.     As such, CleanSpark is entitled to receive all appropriate contribution or indemnification from Defendants Bradford and Love.

**<u>PRAYER FOR RELIEF</u>**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of CleanSpark, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to CleanSpark;

(c)     Determining and awarding to CleanSpark the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing CleanSpark and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CleanSpark and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of CleanSpark to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding CleanSpark restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 26, 2021

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

Respectfully submitted,

Patrick R. Leverty
**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Andrea Ciceri am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of ___5/20/2021___, 2021.

Andrea Ciceri